**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No.: 10-23382-CIV-MORENO/O'SULLIVAN**

OLIVIA GRAVES, on behalf
of herself and the UNITED
STATES OF AMERICA,

      Plaintiff/Relator,

                                        **JURY TRIAL DEMANDED**

vs.

PLAZA MEDICAL CENTERS, CORP.,
HUMANA, INC., and
MICHAEL CAVANAUGH,

      Defendants.

_____/

**FOURTH AMENDED QUI TAM COMPLAINT**
**PURSUANT TO 31 U.S.C. §§ 3729-3732**
**OF THE FEDERAL FALSE CLAIMS ACT**

Relator, Olivia Graves, through counsel, brings this *qui tam* action under 31 U.S.C. §3729,

*et seq.*, as amended (False Claims Act) to recover damages, penalties and other remedies

established by the False Claims Act on behalf of the United States.

**INTRODUCTION**

1.    Since 2005, when Dr. Michael Cavanaugh purchased Plaza Medical Centers, Corp., from

        the Relator Olivia Graves, Dr. Cavanaugh and Plaza Medical Centers have engaged in a

        concerted scheme to defraud the United States Government by diagnosing Medicare

        Advantage patients with unsupported risk-adjusting conditions and submitting those

        diagnoses to CMS for payment, resulting in millions of dollars of unwarranted payments

1

by the United States Government.

2. Humana, Inc., has been a substantial financial beneficiary of Dr. Cavanaugh's fraud, and has facilitated Dr. Cavanaugh's ongoing fraudulent practices by shirking its statutory and contractual obligations to submit accurate risk adjustment data to CMS and put systems in place to detect the very type of fraud Dr. Cavanaugh has been committing:

 a. First, by creating a business relationship that focuses on the maximization of monthly capitation payments at the expense of the provision of accurate medical diagnoses;

 b. Second, by creating an oversight and auditing framework that Humana admits has no actual fraud-detection purpose.   The routine reviews of providers conducted by Humana are used (1) to detect undiagnosed conditions and (2) to educate providers on proper coding and diagnostic procedures.   Neither detects fraud;

 c. Third, by utterly disregarding red flags indicating fraud, waste or abuse on behalf of Dr. Cavanaugh when it was presented to them.

3. Rather than end a mutually beneficial financial arrangement, Humana chose to look the other way, and allowed Dr. Cavanaugh to continue his fraudulent practices not only at Plaza Medical Centers, but also at other facilities he acquired subsequent to 2005, including Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates, all of which service Humana's Medicare Advantage patients.

4. Humana's "partnership" with Dr. Cavanaugh, Plaza Medical Centers, and Plaza's related entities has cost the United States Government tens of millions of dollars.

### PRELIMINARY STATEMENT

5. This action is brought on behalf of the United States pursuant to the False Claims Act, 31

U.S.C. sections 3729, *et seq.*

6.    This action concerns false and fraudulent claims for payment that the Defendants submitted and caused to be submitted to Medicare.   The Defendants routinely and intentionally submitted false and fraudulent claims for payment to Medicare, submitted false reports and made false statements, all as more fully described below.   These submissions were made with the intention of having Medicare increase its capitated payments to Humana and through Humana to Defendants Plaza Medical Centers and Dr. Cavanaugh.   These false claims resulted in the Defendants improperly receiving overpayments from the Centers for Medicare and Medicaid Services (CMS).   Finally, with knowledge the claims were false when submitted, the Defendants failed to notify Medicare of the false claims and resulting overpayments, or to return such overpayments.

7.    Relator brings this action on behalf of the United States pursuant to the "qui tam" provisions of the Acts. Those provisions allow and empower individuals with knowledge of violations of the Acts to file suit on behalf of the government, and to encourage individuals to do so, and provide that these individuals are to share in any resulting recovery.

8.    Relator estimates that the United States has sustained damages as a result of the violations alleged below in excess of hundreds of thousands of dollars, before imposition of lawful penalties, including trebling pursuant to the Acts.

**PARTIES**

9.    Relator, Olivia Graves, is a resident of Miami-Dade County Florida and a practicing medical doctor.

10.     Defendant, Plaza Medical Centers, Corp., is a Florida corporation and operates as a medical office.

11.     Defendant, Humana, Inc., is a foreign corporation authorized to do and doing business in Miami-Dade County, Florida.

12.     Defendant, Michael Cavanaugh, is, on information and belief, a resident of Miami-Dade County, Florida and a medical doctor practicing and controlling several medical offices including Plaza Medical Centers, Corp.   Dr. Cavanaugh is an officer and/or director of Plaza Medical Centers, Corp. and at all times material was acting as its agent and/or apparent agent.   Thus, Plaza Medical Centers, Corp. is vicariously liable for the actions of Dr. Cavanaugh.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 31 U.S.C. § 3732 (federal court jurisdiction for actions brought pursuant to 31 U.S.C. § 3730).

14.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants each maintain their principal place of business in, and transact business, including filing the false claims alleged in this amended complaint, in this district.

## THE MEDICARE PROGRAM

15.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 - 1395ggg, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. The Medicare Program is composed of four parts. Medicare Parts A, B and D are not directly at issue in this case. Medicare Part C authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures.

16.  Part C is the part of Medicare policy that allows private health insurance companies, including Humana, in this case, to act as administrators for the United States government in the provision of Medicare benefits. These Medicare private health plans, such as HMOs and PPOs, are known as Medicare Advantage plans, and the private health insurance companies that run these plans are known as Medicare Advantage Organizations.

17.  Medicare Advantage, otherwise known as Medicare "Part C," authorizes qualified individuals to opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services. 42 U.S.C. §§ 1395w–21, 1395w–28.

18.  Part C allows Medicare beneficiaries to receive all Medicare benefits through private insurance plans, instead of directly from CMS. Under Medicare Advantage, the government pays the private insurer – here, Humana - a monthly "capitation" amount per enrolled beneficiary, which is based on the patient's medical conditions. Thus, every month, CMS pays Humana a pre-determined capitated amount for each beneficiary who is enrolled in one of its Part C Plans based on, among other things, the diagnosis codes that Humana submits for these patients, regardless of whether or not the beneficiary receives medical treatment or otherwise utilizes the Plan's services that month.  Humana, as the responsible Medicare Advantage Organization (MAO), then pays the capitation payment, less a percentage fee for administration, to the participating doctor or medical practice. This is the only way Medicare Part C payments are made:  Participating physicians and medical practices like Dr. Cavanaugh and Plaza Medical cause the medical claims to be presented by providing patient data to their MAO, here Humana, which then makes the actual claim for payment with CMS.   CMS's payment to Humana and Humana's resulting

payment to Plaza Medical and Cavanaugh is proof the claim was actually made.

19.     CMS determines the per-patient capitation amount using actuarial tables based primarily on the patient's medical diagnoses and adjusted for the patient's county of residence and over 70 factors such as age, sex, severity of illness, etc. This is known as "Risk Adjustment." CMS adjusts the capitation rates for each patient monthly, taking into account each patient's previous diagnoses and treatments, which are submitted by the patient's physicians to Humana and by Humana to CMS.

20.     Beneficiaries with more diseases or more serious conditions and more frequent medical treatments would rate a higher monthly capitation payment than healthier beneficiaries, whether or not they are treated on a particular month, and Humana is required to submit that data to CMS. *See* 42 C.F.R. §§ 422.308(c) and 422.310.   In this case, Plaza Medical Centers, based on Dr. Cavanaugh's diagnoses, submitted monthly treatment, diagnosis, billing information for each of its Medicare Part C patients to Humana which submitted them in turn to CMS so CMS could determine an accurate capitation rate. CMS then made payments to Humana based on the patient information provided by Plaza Medical/Cavanaugh and Humana.

21.     CMS has specifically notified Humana and its Part C providers (including Plaza Medical and Cavanaugh) that it relies on the data they submit to make accurate payments: "Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record".  (*See, e.g., CMS* 2013 National Technical Assistance Risk Adjustment 101 Participant Guide at p.13).   Put simply, Medicare relies on the patient diagnosis codes and data submitted by Plaza Medical, Cavanaugh, and Humana to determine the capitation payment per patient.

6

22.     Based on this data, CMS issued monthly capitation payments for each Plaza Medical/Cavanaugh Medicare Part C patient to Humana.   The payments were electronically transferred from CMS to specific Part C accounts designated by Humana. Humana kept a portion of each Part C payment for itself and then remitted the balance of the capitated payment to Plaza Medical Center for each of its Part C patients. Payments were made by Medicare to Humana and by Humana to Plaza Medical Center each month, every month, in precisely this manner.

23.     At least once a month, Humana (like all Part C plans) submits to CMS updated patient information for its enrolled beneficiaries, including the dates of service and diagnosis codes for all claims submitted by a provider for each enrolled beneficiary.   This information was provided to Humana by Plaza Medical Centers and Cavanaugh.   This data is submitted using a specific payment form known as a Risk Adjustment Payment System ("RAPS") report.

24.     CMS uses this RAPS data to reassess its risk assessment level, and therefore the capitation rates, for each enrolled beneficiary for the following Plan year.   Thus, claims submitted in one Plan year would increase the amount of capitation payments for those beneficiaries in subsequent Plan years.

25.     Thus, the submission of additional and/or more medically acute diagnoses and treatment codes for a patient will increase the capitated payments received by Humana and Plaza Medical by deceiving CMS into thinking the patients were far sicker and in need of far more services than they actually were.   The practice of falsifying this information to increase payment rates is known as "upcoding."   This practice was well-known to

providers like Plaza Medical and Humana and of grave concern to CMS.[1]

## DOCTOR GRAVES' INSIDER KNOWLEDGE

26.     Relator, Olivia Graves, is a medical doctor who has practiced for the last 31 years in Miami-Dade County, Florida.

27.     From approximately 1980 through May 31, 2005 Olivia Graves was practicing medicine at the offices then known as Promenade Plaza Medical Center.   During the time that Dr. Graves owned the practice, she was its only medical doctor and was the person responsible for submitting the patient data to Humana for submission to CMS.   In essence, Dr. Graves handled every aspect of the practice from the practice of medicine to administration of the office, including the submission of the appropriate patient records to Humana for billing to CMS.   Like the Defendants in this case, Dr. Graves operated through a capitated contract with Humana, which is the exact same way that Defendant Plaza Medical Centers operates. That is Humana would bill Medicare and pay Dr. Graves based on the census of her patients.   For example, Medicare, through Humana would pay different rates based on the age, sex and medical diagnosis of each patient. Thus, the more complications or medical conditions with which a patient was diagnosed, the more Humana would bill Medicare and the more Humana would pay Dr. Graves.

28.     During the time period that Dr. Graves owned her practice, Humana, through its representatives, explained to Dr. Graves, who controlled the billing process, that Medicare would increase the reimbursement rate or capitated amount for patients on a monthly basis each time a new diagnosis was made on a particular patient.   Medicare would then

---

[1]     For background on how risk adjustment scores are manipulated and CMS's response to same, see the following articles reported by Public Integrity: http://www.publicintegrity.org/2014/10/15/15942/call-more-scrutiny-private-medicare-advantage-plans and http://www.publicintegrity.org/health/medicare/medicare-advantage-money-grab

8

reimburse Humana the increased amount on a monthly basis so long as the new diagnosis was documented in the patient's chart.  Humana would then reimburse Dr. Graves a percentage of the increased capitation amount received from Medicare.  Dr. Graves, from years of experience in the billing process for this medical practice, knows how diagnoses in patients' medical records are converted into submissions by Humana to Medicare.  Dr. Graves, through her many years of owning the practice also knows that once additional diagnoses are submitted to Medicare, Medicare increases the monthly capitation payments to Humana and ultimately to the medical practice.

29.     On or about June 1, 2005 Dr. Graves sold her medical practice to Defendant, Michael Cavanaugh, through an entity named MTS Richmond, LLC and was paid with a check endorsed by Humana. The new entity now running the clinic is known as Plaza Medical Centers, Corp. That entity assumed all of Dr. Graves' contracts with Humana as well as Dr. Graves' Federal Identification Number, and thus Dr. Graves is intimately familiar with how Medicare, through Humana was billed by the Defendants and how Plaza Medical Centers and Dr. Cavanaugh were ultimately compensated, since the submission of patient data to Humana; Humana's resubmission of that data in RAPS reports to CMS; and the payments from CMS to Humana and Humana to the medical practice remained unchanged.

30.     After the sale of her medical practice, Dr. Graves continued to work as a physician at Plaza Medical Centers, Corp, which retained most, if not all of Dr. Graves' patients and administrative procedures, including billing procedures.   However, Dr. Cavanaugh, at his insistence, took over the care of all Medicare patients, including those previously cared for by Dr. Graves. Even though Dr. Cavanaugh became the responsible treating physician for each Medicare Part C patient, the procedures for submitting patient diagnosis and treatment

information by Cavanaugh and Plaza Medical to Humana remained constant.   But the
diagnosis and treatment codes for Dr. Graves' patients did not.

31.     As demonstrated in records provided by Humana to the United States, from the time Dr.
Cavanaugh took over the care of Medicare patients at Plaza Medical Centers, Corp. through
2010, incidence levels for patients he diagnosed with diabetes combined with renal or
ophthalmic problems increased dramatically.   Similarly, the incidence of patients
diagnosed with poly neuropathy increased dramatically, although the patient population
remained fairly constant. Humana was aware of the precipitous and statistically unlikely
increase in these diagnoses, but instead of investigating as required by its Medicare
program integrity guidelines, it intentionally turned a blind eye.

32.     Based on Dr. Graves' experience as the former owner of the practice she knew that once
those false diagnoses were placed in the patients' chart, Medicare would begin to reimburse
Humana at a higher capitation rate for each of those patients on a monthly basis and the
increased rate would continue unless the additional diagnoses were removed.

33.     The diagnoses identified in Paragraph 39 below and in the attached medical records
produced higher capitation payments and were diagnosed far more than the norm for the
patient population. This anomalous disease ratio was readily apparent in Humana's own
RAPS documentation and other claims reports that Humana routinely runs.   Succinctly
stated, Humana had a base level for this patient population based on the many years of data
from the same patients before Dr. Graves sold her practice.   Thus, Humana knew, or
should have known, that Dr. Cavanaugh was manipulating his patients' diagnostic codes
to inflate Medicare Part C capitation payments, and Humana acted deliberately or with
reckless disregard of the truth in submitting the claims information to Medicare, which

then reimbursed Humana and subsequently Plaza Medical Centers and Dr. Cavanaugh at a much higher rate than was actually supported by the patients' actual medical history.

34.   In April 2010, a former patient of Dr. Graves, who was then being cared for by Dr. Cavanaugh, asked to be seen by Dr. Graves.   During that examination, Dr. Graves noticed in the patient's chart that Dr. Cavanaugh had listed several diagnostic codes for the patient that did not apply, and had submitted claims to Humana and Medicare with the false diagnoses that increased the reimbursement by CMS to Humana and in turn from Humana to Plaza Medical and Cavanaugh. When Dr. Graves confronted Dr. Cavanaugh with this evidence, he told her that he "did not give a sh*t."

35.   Dr. Graves became concerned that Dr. Cavanaugh was improperly and intentionally submitting false claims to Medicare regarding other patients.

36.   Dr. Graves therefore started reviewing patient charts for false diagnoses.   Although she discovered improper diagnoses in approximately one hundred randomly selected charts, she was only able to make copies of a small subset, listed in Paragraph 39 below.   The patients identified below represent only a portion of the patients that Cavanaugh and Plaza Medical fraudulently upcoded to increase their Medicare Part C payments, based on Dr. Graves' review of their Medicare Part C patient charts, almost all of which contained upcoded diagnoses by Dr. Cavanaugh that were not supported by the objective laboratory data, x-rays or specialists.

37.   Dr. Graves determined, based on her 30+ years as a practicing physician and as the former owner of the clinic, that Dr. Cavanaugh had similarly and uniformly inflated the diagnostic codes for his Part C patients and had billed Medicare, through his submission of the false patient data to Humana, for the false diagnoses.

38.     When Dr. Cavanaugh and/or Plaza Medical Centers became aware that Dr. Graves was reviewing patients' files, they terminated her employment.

### PATIENT-SPECIFIC ALLEGATIONS OF FRAUDULENT DIAGNOSES

39.     That following subparagraphs explain some of the fraudulent patient claims presented by Cavanaugh, Plaza Medical Centers and Humana to CMS.   These examples are drawn from the subset of Medicare Part C patient charts that Dr. Graves was able to photocopy.   It is not a complete list of the fraudulent patient claims that CMS paid based on upcoded data presented by the Defendants, nor does this paragraph include information about the false claims submitted for patients whose charts Dr. Graves reviewed but was unable to photocopy.   Each one of these examples demonstrate the intentional inclusion of unsupported diagnostic codes that caused CMS to make higher payments to the Defendants that were not supported by the actual medical condition of each patient.   The Defendants submitted these "upcodes" to CMS and CMS increased its capitated payment to the Defendants on a monthly basis:

a.     On June 10, 2009, Dr. Cavanaugh examined a 66-year-old female (C1) with nephropathy and provided the diagnostic codes NIDDM 250.40/583.81 for diabetes with renal complications, including nephritis and neuropathy.   (*See* Exhibit 1). These codes produce a higher Part C payment rate than simple diabetes without renal complications.   However, Dr. Graves' review of the lab work demonstrated that the patient's renal (kidney) functions are normal as illustrated by the GFR, BUN and Creatinine levels and the patient record submitted to CMS for payment was therefore knowingly false.   (Exhibit 1).   Based on Dr. Graves' many years of experience within the practice, she knows that Medicare would have paid a higher

capitation rate than appropriate for this patient, based on the false diagnoses of diabetes with renal complications, including nephritis and neuropathy.

b.    On May 12, 2010 Dr. Cavanaugh examined a 58-year old male (C-2) and diagnosed him with:

    i.    Chronic kidney disease 585.3; and

    ii.    NIDDM with Nephropathy 250.40/583.81.

A review of this patient's file (Exhibit 2) demonstrates that Dr. Cavanaugh made the same improper diagnoses on November 2, 2007; December 1, 2008; August 14, 2009; November 23, 2009; January 27, 2010 and February 15, 2010.   Again, the lab work attached as part of Exhibit 2 belies the diagnoses of kidney disease. Based on Dr. Graves' many years of experience within the practice, she knows that Medicare would have paid a higher capitation rate than appropriate for this patient, based on the false diagnoses of chronic kidney disease and NIDDM with nephropathy.   Furthermore, based on her experience, she knew that Medicare would have started to pay the higher capitation amounts after the diagnoses were first made in November of 2007 and they would continue until those diagnoses are removed.   All of the claims submitted to CMS after that date were thus fraudulent.

c.    On February 19, 2010 Dr. Cavanaugh examined an 84-year old male and signed off on the following diagnoses, which, according to the attached laboratory results (*See* Exhibit 3 incorporated herein), the patient (C3) did not have:

    i.    chronic kidney disease NIDDM 585.3;

    ii.    COPD 496; and

    iii.    V-TACH NIDDM 427.31.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

d.      Patient C4 (Exhibit 4 incorporated herein) is an 83-year old male who was examined by Dr. Cavanaugh on three occasions (March 30, 2009; April 2, 2010 and April 9, 2010).   Dr. Cavanaugh made the following diagnoses, which are not supported by the medical records:

i.      Sick sinus syndrome 427.81;

ii.     COPD 496;

iii.    Spinal stenosis 724.00;

iv.     NIDDM with nephropathy 280.40/583.81;

v.      Chronic kidney disease level III-585.3;

vi.     Hypertensive kidney disease 403.90; and

vii.    PVD 443.9.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

e.      Patient C5 (Exhibit 5 incorporated herein) is a 59-year old female who was examined by Dr. Cavanaugh on five occasions (July 16, 2008; August 22, 2008; November 5, 2008; August 5, 2009 and November 11, 2009).   As to patient C5, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy (250.40/583.8) although this patient is not a

14

diabetic;

ii.    Chronic Kidney Disease Level III 585.3;

iii.    Neuropathy secondary to diabetes 250.60/257.2; and

iv.    Spinal stenosis 724.00.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

f.    Patient C6 (Exhibit 6 incorporated herein) is a 71-year old female who was examined by Dr. Cavanaugh on five occasions (June 16, 2008; October 20, 2008; April 15, 2009; September 16, 2009 and February 10, 2010.   As to patient C6, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.    NIDDM with nephropathy 250.40/583.81;

ii.    Chronic kidney disease Level III585.3;

iii.    Hypertensive kidney disease 408.90;

iv.    Diverticulitis 562.10; and

v.    Chronic hepatitis 571.40.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

g.    Patient C7 (Exhibit 7 incorporated herein) is an 80-year old female who was examined by Dr. Cavanaugh on eight occasions (July 23, 2008; September 3, 2008; November 12, 2008; July 29, 2009; August 10, 2009; December 14, 2009; March

19, 2010 and April 30, 2010).   As to patient C7, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

ii.     NIDDM with hypoglycemia 250.80/251.2;

iii.    Inflammatory Arthritis 714.9;

iv.     Chronic kidney disease Level III 585.3; and

v.      NIDDM with retinopathy 250.50/362.01.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

h.     Patient C8 (Exhibit 8 incorporated herein) is a 69-year old female who was examined by Dr. Cavanaugh on four occasions (April 17, 2009; August 4, 2009; November 16, 2009 and January 29, 2010).   As to patient C8, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

ii.     NIDDM with retinopathy 250.50/362.01; and

iii.    NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

i.      Patient C9 (Exhibit 9 incorporated herein) is a 79-year old male who was examined by Dr. Cavanaugh on four occasions (April 17, 2009; August 4, 2009; November 16, 2009 and January 29, 2010).   As to patient C9, Dr. Cavanaugh made the

following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

ii.     Peripheral neuropathy 356.9; and

iii.    NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

j.     Patient C10 (Exhibit 10 incorporated herein) is a 69-year old female who was examined by Dr. Cavanaugh on seven occasions (January 23, 2007; May 9, 2007; March 3, 2008; May 22, 2008; June 30, 2008; August 3, 2009 and March 31, 2010). As to patient C10, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81; and

ii.     NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

k.     Patient C11 (Exhibit 11 incorporated herein) is a 66-year old female who was examined by Dr. Cavanaugh on six occasions (January 7, 2009; April 24, 2009; September 4, 2009; October 5, 2009; December 14, 2009 and March 26, 2010). As to patient C11, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

      ii.      Chronic kidney disease Level III 585.3;

      iii.     NIDDM with retinopathy 250.50/362.01; and

      iv.     NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

l.     Patient C12 (Exhibit 12 incorporated herein) is a 67-year old female who was examined by Dr. Cavanaugh on five occasions (October 5, 2009; October 19, 2009; March 24, 2010; April 5, 2010 and April 9, 2010).   As to patient C12, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

      i.      Chronic kidney disease Level III 585.3;

      ii.      Mycobacterium disease 031.9;

      iii.     Bursitis 726.10; and

      iv.     Colonic polyps 211.3.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

m.    Patient C13 (Exhibit 13 incorporated herein) is an 81-year old male who was examined by Dr. Cavanaugh on four occasions (March 11, 2009; April 15, 2009; September 14, 2009 and October 23, 2009).   As to patient C13, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

      i.      NIDDM with nephropathy 250.40/583.81;

       ii.      Glaucoma second to diabetes 250.50/365.44; and

       iii.     NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

n.     Patient C14 (Exhibit 14 incorporated herein) is a 67-year old male who was examined by Dr. Cavanaugh on ten occasions (November 10, 2008; December 8, 2008; January 23, 2009; March 27, 2009; July 29, 2009; October 28, 2009; January 20, 2010; March 1, 2010; April 2, 2010; May 14, 2010).   As to patient C14, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

       i.       NIDDM with nephropathy 250.40/583.81;

       ii.      Neuropathy 355.9;

       iii.     Sick sinus syndrome 427.81;

       iv.     NIDDM with retinopathy 250.50/362.01;

       v.      Hypertensive Kidney Disease 403.10;

       vi.     Chronic kidney disease Level III 585.3; and

       vii.    NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

o.     Patient C15 (Exhibit 15 incorporated herein) is an 81-year old male who was examined by Dr. Cavanaugh on eleven occasions (August 29, 2007; September 26,

2007; November 28, 2007; December 26, 2007; March 5, 2008; June 30, 2008; February 18, 2009; April 22, 2009; June 3, 2009; September 2, 2009 and March 22, 2010).   As to patient C15, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

ii.     Peripheral Neuropathy 356.9;

iii.    Chronic kidney disease Level III 585.3;

iv.     NIDDM with retinopathy 250.50/362.01; and

v.      NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

p.      Patient C16 (Exhibit 16 incorporated herein) is a 71-year old male who was examined by Dr. Cavanaugh on six occasions (December 8, 2008; January 23, 2009; March 20, 2009; June 10, 2009; August 12, 2009 and September 16, 2009). As to patient C16, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      IDDM with nephropathy 250.40/583.81;

ii.     Chronic kidney disease Level III 585.3;

iii.    IDDM with retinopathy 250.50/362.01; and

iv.     IDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were

removed.

q.     Patient C17 (Exhibit 17 incorporated herein) is a 69-year old female who was examined by Dr. Cavanaugh on six occasions (August 20, 2008; May 8, 2009; July 6, 2009; November 4, 2009; February 3, 2010 and May 5, 2010).   As to patient C17, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      Chronic kidney disease Level III 585.3; and

ii.     Peripheral Neuropathy 356.9.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

r.     Patient C18 (Exhibit 18 incorporated herein) is a 62-year old female who was examined by Dr. Cavanaugh on four occasions (October 17, 2007; December 3, 2008; April 29, 2009 and September 21, 2009).   As to patient C18, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

ii.     Chronic kidney disease Level III 585.3;

iii.    COPD 496.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

s.     Patient C19 (Exhibit 19 incorporated herein) is a 68-year old female who was examined by Dr. Cavanaugh on nine occasions (July 23, 2007; April 14, 2008; May

19, 2008; July 17, 2008; March 2, 2009; July 17, 2009; February 19, 2010; March 10, 2010 and March 31, 2010).   As to patient C19, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.        NIDDM with nephropathy 250.40/583.81;

ii.       Chronic kidney disease Level III 585.3;

iii.      Fasciitis 729.4/728.7;

iv.      Spinal Stenosis 724.2;

v.       NIDDM with neuropathy 250.60/357.2; and

vi.      Peripheral Neuropathy 356.9.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

t.       Patient C20 (Exhibit 20 incorporated herein) is a 78-year old male who was examined by Dr. Cavanaugh on one occasion (March 17, 2010).   As to patient C20, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.        Pulmonary fibrosis 515;

ii.       Congestive heart failure 428.0;

iii.      Smoker's cough 491.0;

iv.      Tobacco lung disease 500;

v.       Alcoholism 303.91;

vi.      Chronic Kidney Disease level III 585.3;

vii.     Peripheral vascular disease 443.9;

viii.    Bladder outlet obstruction 596.0;

ix.    Acute renal failure secondary to bladder outlet obstruction 586;

x.    Old myocardial infarction;

xi.    History of respiratory failure 518.81.

These diagnoses are noted on April 14, 2010 in an addendum to Dr. Cavanaugh's examination report of March 17, 2010 after Dr. Cavanaugh was confronted by Dr. Graves.   Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

u.    Patient C21 (Exhibit 21 incorporated herein) is an 85-year old female who was examined by Dr. Cavanaugh on one occasion (February 11, 2009).   As to patient C21, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.    NIDDM with nephropathy 250.40/583.81; and

ii.    Chronic kidney disease Level III 585.3.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

v.    Patient C22 (Exhibit 22 incorporated herein) is a 79-year old female who was examined by Dr. Cavanaugh on eleven occasions (December 26, 2007; May 5, 2008; June 16, 2008; June 25, 2008; July 7, 2008; July 14, 2008; July 28, 2008; February 9, 2009; March 9, 2009; October 22, 2009 and April 19, 2010).   As to patient C22, Dr. Cavanaugh made the following diagnoses which are not supported

23

by the medical records:

    i.      NIDDM with nephropathy 250.40/583.81;

    ii.     Congestive heart failure 428.0;

    iii.    COPD 496;

    iv.    NIDDM with retinopathy 250.51/362.01; and

    v.     Atrial fibrillation 427.31.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

    w.    Patient C23 (Exhibit 23 incorporated herein) is a 75-year old female who was examined by Dr. Cavanaugh on four occasions (January 15, 2010; February 17, 2010; March 17, 2010 and April 26, 2010).  As to patient C23, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

    i.      Renal artery stenosis 440.1;

    ii.     Hypertensive Kidney Disease 403.90; and

    iii.    Peripheral neuropathy 356.9.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

    x.    Patient C24 (Exhibit 24 incorporated herein) is a 72-year old male who was examined by Dr. Cavanaugh on eight occasions (April 17, 2009; September 4, 2009; October 2, 2009; October 30, 2009; November 6, 2009; November 13, 2009; December 11, 2009 and January 15, 2010).  As to patient C24, Dr. Cavanaugh

made the following diagnoses which are not supported by the medical records:

i.      Chronic kidney disease Level III 585.3; and

ii.     Hypertensive Kidney Disease, 403.90.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

y.      Patient C25 (Exhibit 25 incorporated herein) is a 71-year old male who was examined by Dr. Cavanaugh on two occasions (September 5, 2008 and April 13, 2009).   As to patient C25, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

ii.     Congestive heart failure 428.0;

iii.    Old myocardial infarction 412;

iv.     Chronic kidney disease Level III 585.3;

v.      NIDDM with vasculopathy 250.70/403.81;

vi.     NIDDM with retinopathy 250.50/362.01;

vii.    Atrial fibrillation 427.31;

viii.   Peripheral vascular disease 443.9; and

ix.     NIDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

z.      Patient C26 (Exhibit 26 incorporated herein) is a 72-year old female who was

examined by Dr. Cavanaugh on six occasions (November 26, 2007; November 17, 2008; January 16, 2009; July 13, 2009; October 26, 2009 and April 2, 2010).   As to patient C26, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.        Peripheral neuropathy 356.9;

ii.       Hypoglycemia secondary to diabetes 251.2/249.80;

iii.      IDDM with vasculopathy 250.70/443.81;

iv.      IDDM with retinopathy 250.50/362.01;

v.       Peripheral vascular disease356.9; and

vi.      IDDM with neuropathy 250.60/357.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

aa.     Patient C27 (Exhibit 27 incorporated herein) is a 73-year old male who was examined by Dr. Cavanaugh on three occasions (April 17, 2009; October 2, 2009 and March 29, 2010).   As to patient C27, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.        Congestive heart failure 428.0;

ii.       Chronic kidney disease Level III 585.3;

iii.      Peripheral Vascular disease 443.9;

iv.      Bladder Outlet Obstruction 596.59; and

v.       Acute renal failure due to bladder outlet obstruction 586/596.50.

Based on Dr. Graves' many years of experience she is aware that Medicare would

have paid a higher capitation amount for these false diagnoses until they were removed.

bb.     Patient C28 (Exhibit 28 incorporated herein) is a 68-year old female who was examined by Dr. Cavanaugh on six occasions (August 18, 2006; March 30, 2007; May 23, 2007; September 17, 2007; September 15, 2008 and October 2, 2009).   As to patient C28, Dr. Cavanaugh made the following diagnoses which are not supported by the medical records:

i.      NIDDM with nephropathy 250.40/583.81;

ii.     COPD 496;

iii.    Chronic gastritis 535.10;

iv.     Stone in the submandibular gland 527.5; and

v.      Sacrolitis 720.2.

Based on Dr. Graves' many years of experience she is aware that Medicare would have paid a higher capitation amount for these false diagnoses until they were removed.

40.     Not only does the laboratory data not support the diagnoses set forth above, few if any of the patients listed above were referred to the medical specialists needed to address the alleged diseases referred to in the billing codes, which would have been medically necessary had those patients actually had the conditions billed by Dr. Cavanaugh through Humana to Medicare.

41.     These 28 patients, whose files Dr. Graves was able to copy are merely the tip of the iceberg. Before her termination, Dr. Graves reviewed over one hundred patient files. In her professional judgment, most, if not all, of the files she reviewed contained fraudulent

diagnoses.

42.   Since then, discovery has yielded the disclosure of over 600 Medicare Part C patient files. After completing her review of the full set of Medicare Part C patient files, Relator identified hundreds of additional patients with diagnoses not supported by the medical records.   These patients and unsupported diagnoses are identified in the appendix attached hereto and incorporated as Exhibit 29.

43.   While some of the fraudulent diagnoses submitted by Cavanaugh and Plaza to Humana and to CMS did not result in increased capitation payments, Dr. Cavanaugh was not personally aware of which diagnoses resulted in increased payments and which did not. His intention was to increase the capitation payments by increasing the number of diagnoses, thus increasing the risk score and corresponding capitation payment.

44.   In each instance, once Cavanaugh and Plaza Medical Center entered the false diagnostic codes in their patient records medical records, they submitted this information to Humana which in turn presented it to CMS.

45.   In each instance, the Defendants submitted claims to CMS for the conditions falsely diagnosed by Dr. Cavanaugh and in each instance where those diagnoses affected the patient's risk adjustment score those conditions resulted in higher Medicare Part C payments for these patients than they would otherwise have been allocated based on the medical conditions they actually had.

46.   In each instance, Defendants knew that the submitted information was false when they presented it for payment, or, solely in the case of Humana, presented same to CMS for payment with reckless disregard or willful ignorance of its truthfulness, with the intent that the United States pay these claims.   And in each instance, the United States, through CMS,

did pay these false claims – as demonstrated below.

47.     Medicare was in fact presented with these false diagnoses, created by Plaza Medical
Centers, by Humana and increased its monthly payment to Humana and consequently to
Plaza Medical Centers as a result of these fraudulent diagnoses. Set forth below are some
examples demonstrating specific instances of presentment by the Defendants to the United
States that caused the United States to increase its payments to the Defendants.   These
examples are not all inclusive, but merely demonstrative of the Defendant's scheme to
defraud and the fact that their scheme induced the United States to make payments to which
the Defendants were not legally entitled.

48.     For example, as to patient C2, the evidence demonstrates that Dr. Cavanaugh began to add
fraudulent diagnoses in November 2007.   Recently obtained evidence shows that patient
C2's risk adjustment factor jumped from 0.8430 in 2007 to 2.4760 in 2008 and to 1.9840
in 2009.    Thus, Medicare's reimbursement to Humana, Plaza Medical Centers, and
Cavanaugh, as to this patient, more than tripled from 2007 to 2008 and to more than double
in 2009 vs 2007.   In 2007 the risk adjusted payment from Medicare to Humana for patient
C2 was $675.34/month.   In 2008 the risk adjusted payment from Medicare to Humana for
patient C2 was $1901.42/month and in 2009 it was $1667.65/month.

49.     The fraudulent diagnoses by Dr. Cavanaugh, as to patient C2 caused Medicare to reimburse
Humana at a higher rate, and the excess profit was then shared with Plaza Medical Centers.

50.     For patient C4, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh
and Plaza Medical Centers to Medicare beginning March of 2009. As a result, Medicare
increased patient C4's risk adjustment factor from 1.015 at the end of 2008 to 3.1491 in
2009.   The corresponding monthly payments from Medicare to Humana, Plaza Medical

Centers and Cavanaugh increased from $779.46/month in 2008 to $2646.89/month in 2009 and $2307.90/month in 2010.

51.     The fraudulent diagnoses by Dr. Cavanaugh, as to patient C4 caused Medicare to reimburse Humana at a higher rate, and the excess profit was then shared with Plaza Medical Centers.

52.     For patient C5, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh and Plaza Medical Centers to Medicare beginning in July of 2008.   As a result, Medicare increased patient C5's risk adjustment factor from 0.4930 in 2007 to 1.630 in 2008.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $394.95/month in 2007 to $1251.74/month in 2008 and $1162.48/month in 2009.

53.     The fraudulent diagnoses by Dr. Cavanaugh, as to patient C5, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

54.     For patient C6, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh and Plaza Medical Centers to Medicare beginning in June of 2008.   As a result, Medicare increased patient C6's risk adjustment factor from 0.2900 in 2007 to 1.0600 in 2008.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $249.78/month in 2007 to $814.02/month in 2008, $817.02/month in 2009 and $1356.39/month in 2010.

55.     The fraudulent diagnoses by Dr. Cavanaugh, as to patient C6, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

56.     For patient C7, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh

and Plaza Medical Centers to Medicare beginning in July of 2008.   As a result, Medicare increased patient C7's risk adjustment factor from 2.053 in 2007 to 2.477 in 2008.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $1644.70/month in 2007 to $1902.19/month in 2008, $1894.60/month in 2009 and $2345.11/month in 2010 when this patient's risk adjustment factor increased to 2.647.

57.    The fraudulent diagnoses by Dr. Cavanaugh, as to patient C7, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

58.    For patient C8, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh and Plaza Medical Centers to Medicare beginning in April of 2009.   As a result, Medicare increased patient C8's risk adjustment factor from 0.854 in 2008 to 1.594 in 2009 and 1.523 in 2010.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $655.82/month in 2008 to $1339.84/month in 2009, and $1349.30/month in 2010.

59.    The fraudulent diagnoses by Dr. Cavanaugh, as to patient C8, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

60.    For patient C9, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh and Plaza Medical Centers to Medicare beginning in April of 2009.   As a result, Medicare increased patient C9's risk adjustment factor from 0.500 in 2008 to 1.725 in 2009 and 1.85 in 2010.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $383.98/month in 2008 to $1449.95/month in

2009, and $1639.00/month in 2010.

61.    The fraudulent diagnoses by Dr. Cavanaugh, as to patient C9, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

62.    For patient C15, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh and Plaza Medical Centers to Medicare beginning in August of 2007.   As a result, Medicare increased patient C15's risk adjustment factor from 1.341 in 2006 to 1.721 in 2007, 2.28 in 2008 2.609 in 2009 and 3.856 in 2010.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $886.69/month in 2006 to $1378.73/month in 2007, $1750.90/month in 2009 and $2193/ month in 2010.

63.    The fraudulent diagnoses by Dr. Cavanaugh, as to patient C15, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

64.    For patient C16, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh and Plaza Medical Centers to Medicare beginning in December of 2008.   As a result, Medicare increased patient C15's risk adjustment factor from 1.146 in 2008 to 2.272 in 2009.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $880.06/month in 2008 to $1909.73/month in 2009.

65.    The fraudulent diagnoses by Dr. Cavanaugh, as to patient C16, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

66.     For patient C23, Humana presented the fraudulent diagnoses it received from Dr. Cavanaugh and Plaza Medical Centers to Medicare beginning in January of 2010.   As a result, Medicare increased patient C23's risk adjustment factor from 0.715 in 2009 1.362 in 2010.   The corresponding monthly payments from Medicare to Humana, Plaza Medical Centers and Cavanaugh increased from $601.00/month in 2009 to $1206.66/month in 2010.

67.     The fraudulent diagnoses by Dr. Cavanaugh, as to patient C23, caused Medicare to reimburse Humana at a higher rate, and the excess profit with then shared with Plaza Medical Centers.

68.     As noted above, the examples listed above are just are small sample. Medicare's records further show a significant increase in the Risk Adjustment Factor for the twenty-eight patients listed above after 2006 through 2013 with corresponding increases in the average monthly payments from Medicare to Humana and ultimately Plaza Medical Centers and Cavanaugh.

69.     In 2006, the average Risk Adjustment Factor for Patients C1 through C28 was approximately 0.9178 with average monthly payments of approximately $624.086.

70.     In 2007, the average Risk Adjustment Factor for Patients C1 through C28 was approximately 1.0835 with average monthly payments of approximately $876.583.

71.     In 2008, the average Risk Adjustment Factor for Patients C1 through C28 was approximately 1.7273 with average monthly payments of approximately $1,363.502.

72.     In 2009, the average Risk Adjustment Factor for Patients C1 through C28 was approximately 1.9758 with average monthly payments of approximately $1,670.019.

73.     In 2010, the average Risk Adjustment Factor for Patients C1 through C28 was

approximately 2.1807 with average monthly payments of approximately $2,005.955.

74. In 2011, the average Risk Adjustment Factor for Patients C1 through C28 was approximately 2.1698 with average monthly payments of approximately $1,928.701.

75. In 2012, the average Risk Adjustment Factor for Patients C1 through C28 was approximately 2.0435 with average monthly payments of approximately $1,904.387.

76. In 2013, the average Risk Adjustment Factor for Patients C1 through C28 was approximately 2.1157 with average monthly payments of approximately $1,969.117.

**PLAZA'S REVIEW OF THE FRAUDULENT DIAGNOSES**

77. When initially confronted with the allegations in this Complaint, Defendants Plaza Medical Centers, Corp., and Dr. Cavanaugh defended the absolute accuracy of their diagnoses.

78. In doing so, Plaza and Cavanaugh disregarded their duty to investigate the accuracy of the diagnoses and immediately inform CMS of the inaccurate diagnoses. It was not until May 15, 2015, Plaza submitted a Condition and Error Report to Humana related to the 28 patients initially identified.   In this Report, Plaza asked CMS to delete inaccurate diagnoses for 18 of the 28 patients initially identified.

79. Subsequently, Plaza Medical Centers was required to review the charts of 30 of the patients identified in Exhibit 29 and answer whether each diagnosis identified in the spreadsheet was accurate. Of the 139 inaccurate diagnoses identified for those 30 patients, Plaza conceded that 21 were inaccurate and should not have been submitted.   For an additional 33 diagnoses, Plaza was unable to substantiate a medical basis for the claim on the date it was originally submitted, or in most cases, for several years of submissions.

80. Further, for 14 additional diagnoses, Plaza conceded that its diagnoses were inaccurate, but that the patient had a less serious form of the illness (e.g. that patient had osteopenia instead

of osteoporosis, or chronic kidney disease level II (ICD-9CM code 585.2) instead of chronic kidney disease level III (ICD-9CM code 585.3)) and that its submission of the more serious illness did not alter the patient's risk score. As noted above, whether it altered the risk score or not was irrelevant. Cavanaugh's intent in submitting the more serious illness was to increase the risk score and thereby increase payment.

81. To date, Plaza has reviewed the validity of 269 diagnoses that Relator has identified as fraudulent. In spite of Plaza's vociferous defense of the accuracy of its diagnoses, Plaza has nevertheless conceded that its medical records did not support 37.18% of the diagnoses codes (100 out of 269) on the day the diagnoses were initially made. Of these 100, Plaza concedes that 67 were entirely unsupported by the medical record at any time.

82. Of course, Relator does not concede that the remaining 62.82% of the allegations of fraud were supported by the medical records. On the contrary, Plaza failed to establish the requisite support for the vast majority of the remaining diagnoses. However, just based on the face of the allegations of the complaint, Plaza has already conceded that 37.18% of its diagnoses in this sample were unsupported by the medical records.

## HUMANA'S OBLIGATIONS UNDER MEDICARE PART C

83. Pursuant to 42 CFR 422.504(l), in order to receive monthly payments, Humana must certify "(based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests." This includes the encounter data submitted by Plaza containing the false diagnoses discussed above.

84. Pursuant to 42 CFR 422.503(b)(4)(vi)(F) Humana was obligated to establish and implement "measures that prevent, detect, and correct fraud, waste, and abuse." The measures should include "external audits, to evaluate first tier entities' [like Plaza]

compliance with CMS requirements and the overall effectiveness of the compliance program."

85.   Since 2006, this express certification of risk adjustment data has been included in CMS's Contracts with Medicare advantage organizations like Humana. The Contract states that "As a condition of payment," Humana must attest that "(based on best knowledge, information, and belief, as of the date specified in the attestation form) that the risk adjustment data it submits to CMS under 422.310 are accurate, complete, and truthful."

86.   Humana has submitted made such certifications of risk adjustment data for Plaza and Dr. Cavanaugh since Dr. Cavanaugh purchased the facility and contracted with Humana.

87.   Humana's certifications of the accuracy of the diagnoses submitted by Plaza constitute false claims, because they were made with reckless disregard for the truth of each certification, because Humana failed in its obligation to establish an effective compliance program to detect fraudulent submissions from providers like Plaza.

**HUMANA'S   FINANCIAL   RELATIONSHIP   WITH   DR.   CAVANAUGH DISINCENTIVIZES IT FROM MEETING ITS STATUTORY OBLIGATIONS**

88.   In order to understand why Plaza failed to meet its obligations to CMS, a discussion of the Humana's very real conflicts of interest is necessary.

89.   Humana bankrolled the inception of Plaza Medical Centers, Corp. Dr. Cavanaugh, Spencer Angel, and Taeho Oh purchased Plaza Medical Centers, Corp., from Dr. Graves on June 1, 2005.   At the close of the sale, the purchasers paid $250,000 as a closing cost.   Humana funded this purchase by providing Dr. Cavanaugh with a $249,000 "capitation advance" on May 31, 2005. *See* Capitation Advance Check, attached hereto as Exhibit 30.

90.   Throughout its existence, Humana has leased 11211 SW 152 Street, Miami, Florida to Plaza Medical Centers, Corp.   This location serves as the clinic and center of operations

for Plaza. The continued operation of Plaza ensures the continued occupancy of Humana's leased property.

91. And, of course, an increase in Plaza's revenue as a result of an increase in MRA risk scores results an increase in revenue for Humana. When Humana informed Dr. Cavanaugh his MRA Scores had significantly increased in a short period of time, he replied: "Good, I am trying to buy that house based on MRA scores." *See* E-mail from Michael Cavanaugh to Ed Henry (6:03 P.M., May 18, 2009), attached hereto as Exhibit 31. As a party financially invested in Plaza Medical Centers, Corp., Humana condoned and encouraged this mindset.

92. The conflict of interest created by Humana's financial entanglement with Plaza violates Humana's Principles of Business Ethics, which prohibit employees from sharing Humana proprietary information—including databases, data, and formulas—for anything outside Humana's ordinary course of business.   (HUM-GRA0000275).

93. Since the formation of Plaza Medical Centers, Corp., Humana employees consistently provide Plaza with prohibited information in a concerted effort to increase its capitation payments and, thus, ensure a return on Humana's investment in the facility.

94. After bankrolling the purchase of Plaza, Humana routinely informed Plaza Medical Centers, Corp., and Michael Cavanaugh on which diagnostic codes were risk-adjusting, when diagnostic codes became risk-adjusting, the value of each risk-adjusting diagnostic code, and the changes to the risk-adjusting value of diagnostic codes.

   a. On November 2, 2005, Ann Holthouser, MRA Clinical Manager of Florida for Humana sent Dr. Cavanaugh information detailing the diagnostic codes for renal conditions and how those codes map to HCC codes.   (PlazaGRA00000187).   This information had not been released to the general public by CMS.   Humana routinely sent updates of

37

this information to Plaza. (PlazaGRA00000189; PlazaGRA00001498).

b. On May 4, 2006, Holthouser sent Dr. Cavanaugh the CMS HCC code rate book via e-mail (PlazaGRA00000208).   The rate book specifies the payment that a provider receives for each HCC code and ranks the codes from highest value to lowest.

c. On December 28, 2006, Ed Henry of Humana's South Florida Market Finance Department gave Dr. Cavanaugh a spreadsheet to calculate the amount of money Plaza will receive for each incremental increase in MRA scores.   (PlazaGRA00000837) This tool was provided on a strictly confidential basis.   It did not estimate the cost of patient care, only the increased payments from CMS.

95. After providing the information necessary to aid Plaza in increasing its MRA scores and capitation rate, Humana kept Plaza and Cavanaugh abreast of all shifts in its MRA and HCC scores.   Humana provided the MRA and HCC scores for its providers in the South Florida market to Plaza and Cavanaugh to assist their efforts to inflate the scores. Disseminating this information served no clinical or therapeutic purpose.

a. On March 20, 2006, Humana agreed to provide monthly reports to Plaza Medical Centers tracking the center's MRA trend report, the Dade County and Humana MRA Trends, and Plaza Medical Center's MRA report.   (PlazaGRA00000435)

b. On January 21, 2009, Dr. Cavanaugh requested the preliminary MRA scores for his offices from Holthouser.   In the ensuing conversation, Ed Henry informed Dr. Cavanaugh that he would have to wait several days for the information, but that it would be "good news." *See* E-mail from Ed Henry to Michael Cavanaugh, et al. (1:44 P.M. Jan. 22, 2009), produced as PlazaGRA00001491 and attached hereto as Exhibit 32.

c. On May 18, 2009, Jertie Pierre of Humana e-mailed Michael Cavanaugh, Marilyn

Feldman, and Myrna Pena, all of Plaza Medical Centers, a comparison of the HCC scores for Florida providers. *See* E-mail from Jertie Pierre to Michael Cavanaugh, et al. (4:47 P.M. May 18, 2009), Ex. 31.

d.   In response to the May 18, 2009 e-mail, Dr. Cavaugh questioned Henry as to why his scores were so low. Henry informed Cavanaugh that the scores reflected outdated information and that his current scores were much higher. E-mail from Ed Henry to Michael Cavanaugh, et al. (6:01 P.M. May 18, 2009), Ex. 31.

96.   Further, Dr. Cavanaugh, Spencer Angel, and Myrna Pena, Chief Compliance Officer and Director of Operations at Plaza Medical Centers, received monthly reports from Humana tracking the MRA scores at Plaza Medical Centers as well as all related PMC entities.

97.   Humana's laser like focus on increasing the risk scores for each patient and maximizing the monthly capitation payments created an environment that encouraged Plaza Medical Centers and Dr. Cavanaugh to inflate their MRA and HCC scores with false and fraudulent diagnoses.

98.   Conversely, Humana's failure to implement an effective fraud detection system ensured that Plaza would get away with it.

99.   The net effect of the combination of Plaza's fraud and Humana's head in the sand approach to fraud detection was that was that both Humana and Plaza would receive more revenue. Thus, Plaza's and Humana's interests in maintaining the status quo were strongly aligned.

**HUMANA'S PROVIDER AUDITS ARE NOT DESIGNED TO DETECT FRAUD, NOR ARE THEY CAPABLE OF IDENTIFYING FRAUD.**

100.    From the outset, Humana established a woefully inadequate framework to oversee the validity and accuracy of the submissions of their contracted providers.  Since Humana begin offering Medicare Part C plans to its members, it has utilized two primary types of audits: MRA reviews, and PDV reviews. Neither are designed to detect fraud.

101.    The MRA reviews are designed primarily to identify ICD-9 Codes for submission to CMS that the providers may have overlooked.  By ensuring that all patient diagnoses are accurately coded and submitted to CMS, Humana ensures that it receives the maximum allowable capitation payment per patient.

102.    PDV reviews are designed to educate physicians on how to best document support in the medical record for the various diagnosis.  The manner in which the PDV reviews are conducted makes them entirely ineffective for detecting inaccurate or fraudulent diagnosis submissions.

103.    Humana began conducting PDV reviews in 2006. Initially, they were triggered when a provider's average risk score was more than two standard deviations from the mean national average risk score.

104.    In 2007, Humana discontinued the use of the risk score to select provider's that would be subject to the PDV review, and began using the "ratio method." The ratio method compared the provider's average risk score to its demographic score to calculate the ratio between the two. The ratio was then provided to the market level who independently made the determination as to whether they would select a provider for a PDV review. There was no threshold ratio that would mandate a review.

105.    The ratio method was replaced in early 2008 with a more detailed analysis that used a figure called a "T-score" that would be generated from a comparison of a provider's

demographic makeup and disease risk score to an average expected score. If the T-score was 2 or higher, a PDV review would be conducted. In 2009, Humana reduced that number to 1.

106.    The use of the T-score was discontinued in 2011.   From that date forward, Humana ceased comparing providers against a cohort of average providers in order to determine which provider should be selected for a PDV review and instead began to perform PDV reviews on all providers with more than 25 patients.

107.    As a result of this change, Humana no longer had a basis to determine whether or not a specific provider was submitting diagnosis codes in a manner that would make them statistical outliers when compared to their peers. As a result, the PDV Reviewer would have no basis to determine whether a particular provider deserved a higher level of scrutiny for potential fraudulent submissions.

108.    But even when PDV reviews were triggered as a result of comparative analyses, the manner in which the review was conducted was not designed to detect unsupported or fraudulent diagnoses.

109.    In its first iteration, the PDV review would cover 30 patients. The reviewer would be tasked to validate one specific ICD-9 code for each patient.   The specific ICD-9 codes were selected because the provider being reviewed was the only provider that had submitted that code.

110.    After the patients and codes had been identified, an associate would obtain medical records from the provider and forward them to the PDV reviewer.   The associate would obtain copies of only the progress notes from the facilities.   They would not obtain lab results or diagnostic studies.

111.    In general, progress notes did not contain the information substantiating a diagnosis of many of the chronic conditions most frequently submitted fraudulently. For example, progress notes from providers rarely identified the diagnostic support for diabetes. The actual lab values for a patient's blood sugar level or Hemoglobin A1C were rarely documented in the progress notes, if ever. Unless the patient was on medication to treat diabetes, such as Metformin, there would be nothing in a progress note that could medically substantiate a diagnosis of diabetes.

112.    Rather than address this deficiency in the review process, Humana instead authorized its reviewers to validate chronic conditions—like diabetes, peripheral vascular disease, or chronic kidney disease—by simply confirming that the diagnosis listed by the provider in the assessment portion of the progress note was also listed in a list "chronic conditions" that Humana provided to its reviewers. (HUM-GRA-0026068-75). The reviewer would not actually check the labs or diagnostic studies to find support in the medical record for the specific chronic condition.

113.    Humana conducted four PDV reviews of Plaza from 2008 to 2011. These four PDV reviews of Plaza validated dozens of fraudulent or inaccurate diagnosis.

114.    The PDV review of the 2007 submissions, conducted in July 2008, found a validation percentage of 80%. However, of the 24 diagnoses that it did find to be validated, 8 of them were inaccurate or fraudulent diagnoses that had no support in the medical records. (HUM-GRA-0000997).

115.    In accordance with Humana's policies, a coding improvement plan was submitted to Plaza Medical Center, and one of its recommendations was to "support all diagnoses given i.e., current treatment or treatment plan for condition." *See* PMC Coding Improvement Plan,

August 13, 2008, (HUM-GRA-0000995) attached hereto as Exhibit 33.   The plan called

for a 6-month re-review.

116.    However, the next review, of the 2008 records, did not occur until March 2009. The 2008

review found a validation percentage of 100%.   However, of the 30 diagnoses that it

validated, 9 of them were inaccurate or fraudulent with no support in the medical records.

(HUM-GRA-0000998).

117.    The 2009 review, conducted in November 2010, found a validation percentage of 65%.

However, of the 116 validated diagnosis, 43 were inaccurate or fraudulent diagnoses with

no support in the medical records.   In addition, the report noted that of the 63 diagnoses it

did not validate, 28 were deficient due to the failure to sign the progress note or other

documentation issues, not because the condition was not supported by the medical records.

Of those 28, 17 of them were inaccurate or fraudulent diagnoses that had no support in the

medical records.   (HUM-GRA-0000999).

118.    In violation of Humana's policies, Humana failed to implement a coding improvement plan

for Plaza Medical Center following the review in November 2010.   *See* Humana Subject

Provider Data Validation Process, May 2010, (HUM-GRA-0009885), attached hereto as

Exhibit 34.   Further, the next re-review was not conducted for nearly a year, rather than

the six months as required by Humana's policies.

119.    The 2010 review, conducted in October 2011, found a validation percentage of 78%.

However, of the 161 diagnosis that it did find validated, 40 were inaccurate or fraudulent

diagnoses that had no support in the medical records.   (HUM-GRA-0001000).   In

addition, the report noted that of the 46 diagnoses it found not validated, 24 were for failure

to sign the progress note or other documentation issues, not because the condition was not

supported by the medical records. Of those 24, 9 were inaccurate or fraudulent diagnoses that had no support in the medical records.

120.    In accordance with Humana's policies, a coding improvement plan was submitted to Plaza Medical Center, and one of its recommendations was to "support all diagnoses given i.e., current treatment or treatment plan for condition." *See* PMC Coding Improvement Plan, October 12, 2011, (HUM-GRA-0000367) attached hereto as Exhibit 35.   The plan called for a 1-year re-review. However, the October 2011 PDV review was the last PDV review performed at Plaza by Humana.

121.    In addition to these failures, Humana allowed Plaza to maintain its improper practice, first noted in 2008, of using two encounter forms for each patient encounter, often with conflicting reports, data, and diagnoses.   (HUM-GRA-0024461).   In 2010, Humana made the same observation with no recourse.   (HUM-GRA-0025342).   Despite repeated overtures to maintain proper medical records, Humana made no effort to enforce its policies to ensure that Plaza maintain concise, clear records. Glaringly, Plaza still maintains two distinct contradictory encounter forms for each patient visit.

**DESPITE HUMANA'S WILFULLY INADEQUATE FRAUD DETECTION SYSTEMS, PLAZA NEVERTHELESS SET OFF RED FLAGS FOR HUMANA.**

122.    At the beginning of Cavanaugh's ownership of Plaza, Humana simply ignored issues that should have raised concerns for a company seeking to fulfill its obligations to CMS.

123.    This failure began with Humana ignoring improper diagnostic standards that Dr. Cavanaugh himself, told Humana he was going to adopt:

    a.   On July 20, 2006, Dr. Cavanaugh informed his staff and Humana personnel that he intends to diagnose his patients Chronic Kidney Disease Level III using an annual glomerular filtration rate (GFR) score.   (PlazaGRA00000237)

b. On July 29, 2006, Humana's Ann Holthouser told Dr. Cavanaugh that CMS cautions against diagnosing Chronic Kidney Disease Level III on the basis of a single abnormal glomerular filtration rate score. Dr. Cavanaugh responded that the score merely confirms diagnoses he intends to make. (PlazaGRA00000236)

c. As set forth in Exhibit 29, *supra*, Dr. Cavanaugh falsely and fraudulently diagnosed 132 patients at Plaza Medical Centers from 2006 to 2011 with Chronic Kidney Disease Level III without valid medical corroboration, including proper GFR levels. These codes were submitted to Humana, who in turn submitted them to CMS for payment.

d. In the PDV reviews conducted for 2007, 2008, 2009, and 2010, Humana failed to identify a single misdiagnosis amongst the 46 diagnoses of Chronic Kidney Disease Level III.

e. Despite warning Dr. Cavanaugh that more than one abnormal GFR score was necessary support the diagnosis of Chronic Kidney Disease Level III, Humana's reviewing team ignored its own diagnostic standard and validated every instance where Dr. Cavanaugh and Plaza Medical Centers submitted the diagnosis of Chronic Kidney Disease Level III for payment.

124. Eventually, even though Humana was not specifically looking for fraud at Plaza, the data it had collected on Plaza was still suspect enough that it began causing concern internally.

125. On January 9, 2012, Humana employee, Mayra Torres, wrote an email to Ann Holthouser, MRA Clinical Manager of Florida for Humana, inquiring about Plaza's elevated MRA scores. In turn, Ann Holthouser sent her the outcomes of the three prior PDV reviews. There was no indication that further action was taken by Ms. Torres. *See* E-mail from

Mayra Torres to Ann Holthouser (5:36 P.M., Jan. 9, 2012), (HUM-GRA-0026931), attached as Exhibit 36.

126.   Further, an April 24, 2012, 2010 spreadsheet of South Florida providers contained a note that "internal audit had [Plaza] on their radar."   (HUM-GRA-0026945).   Despite these red flags, Humana took no steps to determine whether or not Plaza's anomalous results were a result of fraud, that is, until Humana received a copy of the initial Complaint in this case after it was partially unsealed.

### HUMANA CONDUCTS A REVIEW OF PLAZA'S FACILITIES, THE RESULTS OF WHICH INDICATE THE LIKELIHOOD OF FRAUD, YET HUMANA TAKES NO FURTHER ACTION.

127.   In January, 2012, Humana received a copy of the initial Complaint in this case. In order to investigate the allegations, Humana commissioned a statistical analysis comparing the prevalence rates of certain HCC codes submitted by Plaza Medical Center and 9 other Cavanaugh-owned facilities, including Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates, against the prevalence rates of those same HCC codes as submitted by all Florida providers with more than 100 members (The "BRG Report").

128.   The results of this study demonstrated a dramatic increase in the prevalence rates of these HCC codes after Dr. Cavanaugh took over a facilities relative to the prevalence rates of those codes submitted by all Florida providers.

129.   This uptick was especially demonstrable in the 3 facilities that Dr. Cavanaugh took over in 2005 and 2006 - Plaza Medical Center, Corp., PMC Plantation, and PMC West Oakland Park.

130.   The BRG Report focused on the prevalence rates for the 12 most prevalent HCC's in Humana's Florida Provider network from 2005 – 2010.   The average prevalence rate of each HCC submitted by Plaza was compared against the average prevalence rate for the respective HCC's for all Humana Florida Providers with at least one hundred members. *See* BRG Report Excerpt, attached as Exhibit 37.

131.   Of the 12 major HCC's, Plaza's prevalence rate ranked in the 77th percentile of Florida providers or higher for 9 of them.   Plaza's specific percentiles were as follows:

a.   Vascular Disease - 77.87%;

b.   Chronic Obstructive Pulmonary Disease (COPD) - 93.12%;

c.   Renal Failure - 88.76%;

d.   Congestive Heart Failure - 93.23%;

e.   Diabetes with Renal or Peripheral Circulatory -99.43%;

f.   Polyneuropathy - 99.31%;

g.   Angina Pectoris/Old Myocardial Infarction - 83.03%;

h.   Specified Heart Arrhythmias - 88.99%; and

i.   Rheumatoid Arthritis - 94.15%.

*See* Ex. 37.

132.   These findings are consistent with the findings of Relator's reviews.   This especially holds true with respect to the frequency of the diagnoses of diabetes with nephropathy and diabetes with neuropathy, both of which found Plaza ranked in the 99 percentile as compared to other Florida providers.   Indeed, Plaza's findings of diabetes *without complication* came in at only 53.56%.

133.   This pattern of increasing prevalence rates was visible not just at Plaza, but also at two

other Cavanaugh owned facilities that had been acquired around the same time as Plaza.

134.   Plaza Medical Centers, Corp., is owned by three individuals: Spencer Angel, Dr. Michael Cavanaugh, and Taeho Oh. This group owns a network of providers in Florida under the Plaza brand: PMC Plantation, PMC West Oakland Park, PMC Jackson South, PMC Kendall, PMC North Shore, PMC Hillsboro, PMC Homestead, PMC Palmetto Bay, PMC Physician Associates, PMC Physician Management, and Caribe Physician Associates.

135.   The PMC network facilities owned by Angel, Cavanaugh, and Oh share business philosophies, policies, procedures, personnel, and services.

136.   Upon purchasing a new PMC facility, Spencer Angel oversees the "normalization process" of the new facility, which ensures a standardized operational practices throughout the Plaza network. The processes affected include the referral processes, patient scheduling, staffing, information systems, and other aspects of the provider's daily practice.

137.   Doctors employed at other PMC entities are trained at Plaza Medical Centers prior to assignment at another facility. By standardizing the practices between the facilities, doctors are able to fluidly move between the facilities.   For example, Dr. Scholl was trained by Dr. Cavanaugh at Plaza Medical Centers and has worked at Plaza Medical Centers, PMC Kendall, and PMC Homestead.

138.   Physicians were not the only interchangeable personnel within the PMC network. Physician assistants are similarly trained at Plaza Medical Centers and transferred from one PMC facility to another.

139.   The Chief Compliance Officer and Director of Operations at Plaza Medical Centers, Myrna Pena, visits all PMC facilities twice monthly and ensure they are complying with the corporate policies. The policies and procedures that Ms. Pena ensures that all PMC

facilities follow were drafted by Spencer Angel.

140. Further, she oversees compliance at all PMC entities. Prior to naming Ms. Pena compliance officer at all facilities in 2013, all facilities shared outside compliance counsel. Her compensation for her dual roles is allocated across all facilities.

141. The Coordinator of Chart Review at Plaza Medical Centers, Brenda Milton, reviews each PMC facility to ensure uniformity in its coding policies and procedures. She performs these reviews at the direction of Spencer Angel and Myrna Pena. In this role overseeing the coding at each facility, she coordinates Humana's coding reviews at all PMC facilities.

142. The coding team employed by Plaza Medical Centers is allocated to other PMC entities to train employees, provide day-to-day coding operations, and perform auditing and oversight reviews of the facilities.

143. The coders at each PMC facility are charged with entering encounter data into each facility's computer system, but the central coding team out of Plaza Medical Centers is tasked with ultimately reviewing the ICD-9CM codes and submitting the codes to Humana. Further, certain PMC facilities do not employ coders and rely on the retained services of the team at Plaza Medical Centers.

144. Brenda Milton is also a member of the MRA HEDIS Team at Plaza Medical Centers. The MRA HEDIS Team is allocated to the PMC Physician Associates to provide MRA coding, training, and auditing services to client facilities outside of the PMC network.

145. Marketing for the PMC facilities are handled by two individuals assigned, one assigned to Dade County and one assigned to Broward County. Valerie Martin, the marketing director for Dade County, is assigned to Plaza Medical Centers, but she provides services to other PMC facilities at the direction of Spencer Angel. Though she is employed by Plaza

Medical Centers, her salary is allocated between the PMC facilities based on each facility's share of the gross revenue of all facilities.

146. The business practices at Plaza Medical Centers, Corp., as well at its sister facilities, is organized and deliberate.  The standardization of processes among and at each facility ensures that the practices are "normalized," in the words of Spencer Angel.   Given the top down model of the organization, as visualized by Chart 1 on the following page, it is no surprise then that other Cavanaugh owned facilities also exhibited the same dramatic spike in prevalence rates once he and Angel took over ownership.

**Chart 1**



**Plaza Medical Centers, Corp.**
Owners: Spencer Angel, Dr. Michael Cavanaugh, Taeho Oh
Managing Members: Spencer Angel, Michael Cavanaugh

**Employs, Pays the Salaries, and Controls the Day-to-Day Operations for**

| **Spencer Angel** President | **Dr. Michael Cavanaugh** Medical Director | **Myrna Pena** Chief Compliance Officer & Director of Operations | **Brenda Milton** Coordinator of Chart Review | **Coding Team** Performs Coding, Auditing & Oversight Services | **Valerie Martin** Marketing Director | **MRA HEDIS Team** Performs Progress Note Coding at Plaza |
|---|---|---|---|---|---|---|
| Normalizes business operations across the PMC network by setting corporate policies and procedures. | Provides medical training to new medical staff at Plaza Medical Centers before transferring to another PMC entity. | Serves as the Chief Compliance Officer and Director of Operations to all PMC entities. Visits all facilities bi-monthly in this role. | Reviews the coding policies and procedures at each PMC entity to ensure uniformity across the network. | Trains employees, provides day-to-day coding operations, and audits oversight and review across the PMC Network | Serves all Miami-Dade County PMC entities. Isabella Gazelle serves as the Marketing Director for Broward. | Allocated to PMC Physician Associates to provide MRA training, coding, and auditing contract work. |
| **All Plaza Medical Center Entities, including Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates.** | | | | | **All Miami-Dade County PMC Entities** | **PMC Physician Associates** |

**HUMANA KNEW OF FRAUDULENT ACTIVITY ACROSS THE PMC NETWORK**

147.   The fraudulent scheme was not relegated solely to Plaza Medical Centers, it was and is pervasive across the entire PMC network, including Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates.

148.   Cavanaugh and Angel purchased PMC Plantation in 2005. Soon thereafter, the BRG report shows the existence of a similar, if not more dramatic than Plaza's spike in the HCC prevalence rates.   PMC Plantation was in the 74th percentile or higher for *every* studied HCC code, *except* for diabetes without complication.   The highest figures were very similar to those found at Plaza:

a.   COPD - 89.56%;

b.   Renal Failure - 85.09%;

c.   Diabetes with Renal or Peripheral Circulatory - 95.64%;

d.   Polyneuropathy - 93.23%; and

e.   Specified Heart Arrhythmias - 90.25%.

*See* BRG Report Excerpt, attached as 38.

149.   The same pattern was demonstrated at PMC West Oakland Park, where Dr. Cavanaugh took over in 2006.   By 2010, PMC West Oakland Park's percentiles for 10 out of the 12 HCC's were above 76%.   Specifically, West Oakland Park's prevalence rate percentiles were as follows:

a.   Vascular Disease - 97.48%;

b.   COPD - 91.74%;

c.   Renal Failure - 97.59%;

d.   Congestive Heart Failure, - 98.51%;

e.   Diabetes with Renal or Peripheral Circulatory - 86.58%;

f.   Polyneuropathy - 100%; and

g.   Specified Heart Arrhythmias - 95.41%.

Meanwhile, PMC West Oakland Park's prevalence rate percentage for diabetes without complication dropped to 5.85%.   *See* BRG Report Excerpt, attached as 39.

150.   Essentially, no patient at West Oakland Park had diabetes without *any* comorbidities. Every patient with diabetes also had complications.   Graphically, the uptick with patients diagnosed with complications from diabetes coincides neatly with the drop in the patients suffering from diabetes without complications.   *See* BRG Report Excerpt, attached as 40.

151.   The BRG Report also performed this analysis on other Plaza facilities that had not been purchased until after 2010, thus providing Humana with a readily available basis for comparison.   The graphs of the prevalence rates at those facilities mirror the prevailing prevalence rates for the Florida control group as a whole.   *See* BRG Report Excerpt, attached as 41.   Meanwhile, the graphs of the prevalence rates for the facilities that Dr. Cavanaugh took over diverge wildly from the control group rates and almost immediately after his acquisition.

152.   Despite these very clear graphical and numerical indicators that the HCC submission rates of Cavanaugh's facilities deviated wildly from the norm, Humana took no further action, and the Plaza facilities remain Humana providers to this date.

153.   This failure to act stands in stark contrast to the actions that Humana took with respect to Dr. Isaac Thompson in 2013.   Dr. Isaac Thompson was a Humana Medicare Advantage

provider in Palm Beach County. Dr. Thompson's partner reported to Human that Dr. Thompson had been submitting falsified diagnoses for Humana members since 2006.

154.  As a result of those allegations, Humana conducted a two-part statistical analysis of Dr. Thompson's diagnosis code submissions. First, Humana flagged all diagnosis codes submitted by Dr. Thompson that "exhibited a statistically significant increase in member prevalence from one year to the next."  *See* Letter from Humana to CMS, Oct. 29, 2013, attached hereto as Exhibit 42. Specifically, Humana flagged all diagnosis codes that "exhibited a prevalence rate increase that was in the 90th percentile of all prevalence rate increases in Humana's control group of Florida providers."

155.  Humana determined that increases in year over year member prevalence in excess of the 90th percentile were statistically significant, as the 90th percentile fell between 1 and 2 standard deviations from the mean increase in year over year member prevalence exhibited by the control group of Humana Florida providers.  *See* Ex. 42.

156.  Next, Humana then "isolated diagnosis codes for which [Dr. Thompson's centers] were in the 90th percentile in terms of overall diagnosis code submission – measured again by diagnosis code prevalence rate - when compared to the control group of Florida providers." This second analysis is the same type of analysis that Humana performed on the Plaza facilities, albeit using ICD-9 codes instead of the broader HCC codes.

157.  Humana determined that the prevalence rates for each condition in excess of the 90th percentile were statistically significant, as the 90th percentile fell between 1 and 2 standard deviations from the prevalence rate for each condition as exhibited by the control group of Humana Florida providers.

158.   Finally, for those codes that exhibited both a statistically significant increase in member prevalence and a high overall member prevalence rate, Humana undertook an analysis of clinical indicators available from the patient data to assess the accuracy of the diagnoses at issue.   After completing the investigation, Humana elected to delete over 52 million dollars in "potentially inaccurate diagnoses."   *See* Ex. 42.

159.   The BRG Report created by Humana in 2012 demonstrated the existence of both statistically significant increases in member prevalence rates and high overall prevalence rates for many of the HCC's studied at Plaza Medical Center, PMC Plantation and PMC West Oakland Park.   These increases corresponded neatly with Cavanaugh's acquisition of each facility. The same increases were absent at the other PMC facilities that had been acquired after 2010.

160.   Even though these same findings were deemed significant enough to compel Humana to conduct further investigation into Dr. Thompson's facilities and eventually repay CMS over 50 million dollars, Humana simply chose to look the other way the other with respect to the Plaza facilities.   Humana conducted no further investigation, and has made no reimbursements other than for Code deletions submitted by Plaza itself.

161.   Humana has thus failed to fulfill its obligations to CMS thoroughly investigate allegations of fraud and reimburse CMS for the overpayments that it received.

162.   The prevalence rates for the HCC and ICD-9 codes for Plaza have always been available to Humana, as have the same rates for all of its Florida providers. Humana simply chose not to examine or compare them. Had they done so, because the change in these prevalence rates was so blatant and both statistically and medically unlikely, the upcoding by Cavanaugh and Plaza Medical would have been readily apparent to Humana. By choosing

to utilize a provider review system that Humana specifically knew could not detect fraud of the type committed by Cavanaugh and Plaza, Humana acted with, at best, deliberate ignorance or reckless disregard for their truth or falsity when it submitted the falsely upcoded patient data to CMS for payment.

163.  Because Humana was benefiting, both as Plaza's landlord and as its MAO, from the increased capitation rates along with Plaza Medical Centers and Dr. Cavanaugh, Humana had no incentive to stop Dr. Cavanaugh from submitting false diagnoses to CMS.

164.  And even after to being forced to remove its proverbial head from the sand as a result of this lawsuit, Humana has still failed in its obligation to inform CMS of the inaccurate diagnoses and offer reimbursement for them.

**COUNT I**
**SUBMITTING FALSE CLAIMS IN VIOLATION OF THE**
**FALSE CLAIMS ACT, 31 U.S.C. SECTION 3729(a)(1)(A)**
**AGAINST CAVANAUGH AND PLAZA MEDICAL CENTERS, CORP**
**(POST JUNE 7, 2008 CLAIMS)**

165.  The allegations contained in Paragraphs 1 through 164 are incorporated by reference as if fully set forth herein.

166.  As disclosed in Plaza Medical Center's corporate filings with the Florida Department of State, Defendant Cavanaugh is an owner, officer, and director of Plaza Medical Centers, Corp.

167.  Cavanaugh was at all times was acting within the course and scope of his employment and corporate office.  His knowledge is therefore imputed to Plaza Medical Centers, Corp., which is therefore both directly and vicariously liable for the fraudulent actions of Defendant Cavanaugh.

168.  Defendant Cavanaugh is the doctor who signed all of the false diagnoses alleged in

Paragraphs 39(a)-(bb) *supra*, and authorized them to be submitted to CMS, which information was material to the United States paying these false claims.

169.   The foregoing false diagnoses were in fact submitted to CMS and the United States made payment based on this false information.

170.   As described above, Cavanaugh and Plaza Medical, acting in concert with Humana, knowingly presented or caused to be presented to an officer or employee of the United States for payment or approval the false or fraudulent claims described in Paragraphs 39(a)-(bb) above, with knowledge they were false or with deliberate ignorance or reckless disregard for their truth or falsity.

171.   The United States paid the false claims submitted by Cavanaugh and Plaza Medical, in concert with Humana, and has therefore sustained damages as a result of the false claims in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below.

### COUNT II
### SUBMITTING FALSE CLAIMS IN VIOLATION OF THE
### FALSE CLAIMS ACT, 31 U.S.C. SECTION 3729(a)(1)(A)
### AGAINST DEFENDANT HUMANA, INC.
### (POST JUNE 7, 2008 CLAIMS)

172.   The allegations contained in Paragraphs 1 through 170 are incorporated by reference as if fully set forth herein.

173.   Humana approved and accepted Defendants Cavanaugh and Plaza Medical Centers, Corp. as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

174.   Humana also approved and accepted Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates as providers in the

Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

175.   Under Medicare's rules and regulations, Defendant Humana, Inc. had a duty to certify the accuracy of the risk adjustment data it submitted to CMS, and to ensure that procedures were in place to prevent the submission of fraudulent diagnoses such as those contained in Paragraphs 39(a)-(bb) *supra* to Medicare and to investigate, detect, and discourage such fraud.

176.   As set forth above, Humana's agents and/or employees audited and reviewed the medical charts maintained at Plaza Medical Centers, Corp., and across its network.   Humana, through its agents and employees, in certifying the accuracy of the risk adjustment data it was submitting on behalf of Plaza, either knew or acted with reckless disregard to the fact that Plaza Medical Centers' medical charts contained false diagnoses such as those contained in Paragraphs 39(a)-(bb) *supra*, because those false diagnoses were detectable and Humana would have detected them had Humana conducted its audits in conformity with Medicare requirements.[2]

177.   Defendant Humana, Inc. knowingly presented or caused to be presented to an officer or employee of the United States for payment or approval the false or fraudulent claims described in Paragraphs 39(a)-(bb) above, with knowledge they were false and/or with deliberate ignorance or reckless disregard for their truth or falsity.   The information submitted by Humana was material to the United States' payment of the foregoing false claims.

---

[2]   See, e.g., Dept. of Health and Human Services, Office of Inspector General, publication OEI-03-10-00310, *Medicare Advantage Organizations' Identification of Potential Fraud and Abuse*, Daniel R. Levenson, Inspector General (Feb. 2012) at https://oig.hhs.gov/oei/reports/oei-03-10-00310.asp

178.   The United States paid the false claims submitted by Humana and has therefore sustained

damages as a result of the false claims in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below.

**COUNT III**
**MAKING, USING, OR CAUSING TO BE MADE OR USED, FALSE RECORDS**
**MATERIAL TO A FALSE OR FRAUDULENT CLAIM IN VIOLATION OF THE**
**FALSE CLAIMS ACT, 31 U.S.C. SECTION 3729(a)(1)(B) AGAINST DEFENDANTS**
**CAVANUAGH AND PLAZA MEDICAL CENTERS**
**(POST JUNE 7, 2008 CLAIMS)**

179.   The allegations contained in Paragraphs 1 through 164 are incorporated by reference as if

fully set forth herein.

180.   Defendant Cavanaugh is an owner, officer, and director of Plaza Medical Centers, Corp.

and was at all times was acting within the course and scope of his employment and

corporate office.  His knowledge is therefore imputed to Plaza Medical Centers, Corp.,

which is therefore both directly and vicariously liable for the fraudulent actions of

Defendant Cavanaugh.

181.   Defendant Cavanaugh is the doctor who signed all of the false diagnoses alleged in

Paragraphs 39(a)-(bb) *supra* and authorized them to be submitted to CMS for payment.

182.   The foregoing false diagnoses were in fact submitted to CMS and the United States made

payment based on this false information.

183.   Defendants Plaza Medical Centers, Corp., and Michael Cavanaugh knowingly made, used,

or caused to be made or used, false records or statements as exemplified in Paragraphs

39(a)-(bb) which were material to the fraudulent claims submitted to and paid by the United

States as alleged herein.

184.   By virtue of the false or fraudulent records or statements made by Defendants, Plaza

Medical Centers, Corp. and Michael Cavanaugh, the United States suffered damages in an

amount to be determined at trial.

Wherefore, Relator prays for the relief set forth below.

### COUNT IV
### MAKING, USING, OR CAUSING TO BE MADE OR USED, FALSE RECORDS MATERIAL TO A FALSE OR FRAUDULENT CLAIM IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. SECTION 3729(a)(1)(B) AGAINST DEFENDANT HUMANA, INC
### (POST JUNE 7, 2008 CLAIMS)

185.   The allegations contained in Paragraphs 1 through 164 and 179 through 184 are incorporated by reference as if fully set forth herein.

186.   Humana approved and accepted Defendants Cavanaugh and Plaza Medical Centers, Corp. as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

187.   Humana also approved and accepted Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

188.   Under Medicare's rules and regulations, Defendant Humana, Inc. had a duty to certify the accuracy of the risk adjustment data it submitted to CMS, and to ensure that procedures were in place to prevent the submission of fraudulent diagnoses such as those contained in Paragraphs 39(a)-(bb) *supra* to Medicare and to investigate, detect, and discourage such fraud.

189.   As set forth above, Humana's agents and/or employees audited and reviewed the medical charts maintained at Plaza Medical Centers, Corp., and across its network.  Humana, through its agents and employees, in certifying the accuracy of the risk adjustment data it

60

was submitting on behalf of Plaza, either knew or acted with reckless disregard for the fact that Plaza Medical Centers' medical charts contained false diagnoses such as those contained in Paragraphs 39(a)-(bb) *supra*, because those false diagnoses were detectable and Humana would have detected them had Humana conducted its audits in conformity with Medicare requirements.

190.   Defendant, Humana, Inc. knowingly made, used, or caused to be made or used, false records or statements as exemplified in Paragraphs 39(a)-(bb) which were material to the fraudulent claims submitted to and paid by the United States as alleged herein.

191.   By virtue of the false or fraudulent records or statements made by Defendant, Humana, Inc. the United States suffered damages in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below.

**COUNT V**
**SUBMITTING CLAIMS IN**
**VIOLATION OF THE FALSE CLAIMS ACT,**
**31 U.S.C. SECTION 3729(a)(1) DEFENDANTS**
**CAVANAUGH AND PLAZA MEDICAL CENTERS**
**(PRE JUNE 7, 2008)**

192.   The allegations contained in Paragraphs 1 through 164 are incorporated by reference as if fully set forth herein.

193.   As disclosed in Plaza Medical Center's corporate filings with the Florida Department of State, Defendant Cavanaugh is an owner, officer, and director of Plaza Medical Centers, Corp.

194.   Cavanaugh was at all times was acting within the course and scope of his employment and corporate office.  His knowledge is therefore imputed to Plaza Medical Centers, Corp., which is therefore both directly and vicariously liable for the fraudulent actions of Defendant Cavanaugh.

195.   Defendant Cavanaugh is the doctor who signed all of the false diagnoses alleged in Paragraphs 39(a)-(bb) *supra*, and authorized them to be submitted to CMS, which information was material to the United States paying these false claims.

196.   The foregoing false diagnoses were in fact submitted to CMS and the United States made payment based on this false information.

197.   As described above, Cavanaugh and Plaza Medical, acting in concert with Humana, knowingly presented or caused to be presented to an officer or employee of the United States for payment or approval the false or fraudulent claims described in Paragraphs 39(a)-(bb) above, with knowledge they were false or with deliberate ignorance or reckless disregard for their truth or falsity.

198.   The United States paid the false claims submitted by Cavanaugh and Plaza Medical, in concert with Humana, and has therefore sustained damages as a result of the false claims in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below.

## COUNT VI
## SUBMITTING CLAIMS,
## IN VIOLATION OF THE FALSE CLAIMS ACT,
## 31 U.S.C. SECTION 3729(a)(1) DEFENDANT
## HUMANA, INC.

199.   The allegations in Paragraphs 1 through 164 and 192 to 198 are incorporated by reference as if fully set forth herein.

200.   Humana approved and accepted Defendants Cavanaugh and Plaza Medical Centers, Corp. as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

201.    Humana also approved and accepted Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

202.    Under Medicare's rules and regulations, Defendant Humana, Inc. had a duty to certify the accuracy of the risk adjustment data it submitted to CMS, and to ensure that procedures were in place to prevent the submission of fraudulent diagnoses such as those contained in Paragraphs 39(a)-(bb) *supra* to Medicare and to investigate, detect, and discourage such fraud.

203.    As set forth above, Humana's agents and/or employees audited and reviewed the medical charts maintained a Plaza Medical Centers, Corp., and across its network.  Humana, through its agents and employees, in certifying the accuracy of the risk adjustment data it was submitting on behalf of Plaza, either knew or acted with reckless disregard for the fact that Plaza Medical Centers' medical charts contained false diagnoses such as those contained in Paragraphs 39(a)-(bb) *supra*, because those false diagnoses were detectable and Humana would have detected them had Humana conducted its audits in conformity with Medicare requirements.

204.    Defendant Humana, Inc. knowingly presented or caused to be presented to an officer or employee of the United States for payment or approval the false or fraudulent claims described in Paragraphs 39(a)-(bb) above, with knowledge they were false and/or with deliberate ignorance or reckless disregard for their truth or falsity.  The information

submitted by Humana was material to the United States' payment of the foregoing false claims.

205.  The United States paid the false claims submitted by Humana and has therefore sustained damages as a result of the false claims in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below.

**COUNT VII**
**MAKING, USING, OR CAUSING TO BE MADE OR USED, FALSE RECORDS**
**TO GET A FALSE OR FRAUDLENT CLAIM**
**PAID OR APPROVED BY THE GOVERNMENT**
**31 U.S.C. SECTION 3729(a)(2) AS TO**
**DEFENDANTS CAVANUAGH AND PLAZA MEDICAL CENTERS**
**(PRE JUNE 7, 2008 CLAIMS)**

206.  The allegations contained in Paragraphs 1 through 161 a4e incorporated by reference as if fully set forth herein.

207.  Defendant Cavanaugh is an owner, officer, and director of Plaza Medical Centers, Corp. and was at all times was acting within the course and scope of his employment and corporate office.  His knowledge is therefore imputed to Plaza Medical Centers, Corp., which is therefore both directly and vicariously liable for the fraudulent actions of Defendant Cavanaugh.

208.  Defendant Cavanaugh is the doctor who signed all of the false diagnoses alleged in Paragraphs 39(a)-(bb) *supra* and authorized them to be submitted to CMS for payment.

209.  The foregoing false diagnoses were in fact submitted to CMS and the United States made payment based on this false information.

210.  Defendants Plaza Medical Centers, Corp., and Michael Cavanaugh knowingly made, used, or caused to be made or used, false records or statements as exemplified in Paragraphs 39(a)-(bb) which were material to the fraudulent claims submitted to and paid by the United

64

States as alleged herein.

211.   By virtue of the false or fraudulent records or statements made by Defendants, Plaza Medical Centers, Corp. and Michael Cavanaugh, the United States suffered damages in an amount to be determined at trial.

Wherefore, Relator prays for the relief set forth below.

## COUNT VIII
## MAKING, USING, OR CAUSING TO BE MADE OR USED, FALSE RECORDS TO GET A FALSE OR FRAUDLENT CLAIM PAID OR APPROVED BY THE GOVERNMENT 31 U.S.C. SECTION 3729(a)(2) AS TO DEFENDANT HUMANA (PRE JUNE 7, 2008 CLAIMS)

212.   The allegations contained in Paragraphs 1 through 164 and 206 to 211 are incorporated by reference as if fully set forth herein.

213.   Humana approved and accepted Defendants Cavanaugh and Plaza Medical Centers, Corp. as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

214.   Humana also approved and accepted Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC Homestead, PMC Palmetto Bay, and PMC Physician Associates as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

215.   Under Medicare's rules and regulations, Defendant Humana, Inc. had a duty to certify the accuracy of the risk adjustment data it submitted to CMS, and to ensure that procedures were in place to prevent the submission of fraudulent diagnoses such as those contained in Paragraphs 39(a)-(bb) *supra* to Medicare and to investigate, detect, and discourage such

fraud.

216.    As set forth above, Humana's agents and/or employees audited and reviewed the medical

charts maintained a Plaza Medical Centers, Corp., and across its network.  Humana,

through its agents and employees, in certifying the accuracy of the risk adjustment data it

was submitting on behalf of Plaza, either knew or acted with reckless disregard for the fact

that Plaza Medical Centers' medical charts contained false diagnoses such as those

contained in Paragraphs 39(a)-(bb) *supra*, because those false diagnoses were detectable

and Humana would have detected them had Humana conducted its audits in conformity

with Medicare requirements.

217.    Defendant, Humana, Inc. knowingly made, used, or caused to be made or used, false

records or statements as exemplified in Paragraphs 39(a)-(bb) which were material to the

fraudulent claims submitted to and paid by the United States as alleged herein.

218.    By virtue of the false or fraudulent records or statements made by Defendant, Humana,

Inc. the United States suffered damages in an amount to be determined at trial.

Wherefore, Relator prays for relief as set forth below.

### COUNT IX
### KNOWINGLY CONCEALING OR KNOWINGLY AND IMROPERLY AVOIDING OR DECREASING AN OBLIGATION TO PAY OR TRANSMIT MONEY TO THE GOVERNMENT IN VIOLATION OF 31 U.S.C. SECTION 3729(a)(1)(G), AS TO PLAZA MEDICAL CENTERS AND CAVANAUGH

219.    The allegations contained in Paragraphs 1 through 161 are incorporated by reference as if

fully set forth herein.

220.    Dr. Cavanaugh is an owner, officer, and director of Plaza Medical Centers, Corp. and was

at all times acting within the course and scope of his employment and corporate office.

His knowledge is therefore imputed to Plaza Medical Centers, Corp., which is therefore

both directly and vicariously liable for the fraudulent actions of Dr. Cavanaugh.

221. Dr. Cavanaugh is the doctor who signed all of the false diagnoses alleged in Paragraphs 39(a)-(bb) *supra* and authorized them to be submitted to CMS for payment.

222. The foregoing false diagnoses were in fact submitted to CMS, and the United States made payment based on this false information.

223. Those payments by the United States were received and retained by Plaza Medical Centers Corp. and Cavanaugh, who disclosed in discovery that they had reimbursed the United States for only one payment for one patient on one occasion.

224. After the seal in this matter was partially lifted on December 2, 2011, Plaza Medical Centers, Corp., was notified of the false, unsupported, and erroneous diagnoses alleged in Paragraphs 39(a)-(bb) *supra*.

225. Based on this information, Plaza Medical Centers and Cavanaugh had a duty under the Medicare and Medicaid program integrity provisions of the Affordable Care Act to investigate and identify any funds received or retained to which it was not entitled, also known as an "overpayment."

226. Pursuant to 42 U.S.C. § 1320a-7k, Plaza Medical Centers, Corp. and Cavanaugh were required to report and return each overpayment to the United States within 60 days of the date on which it was identified. Plaza Medical Centers, Corp. and Cavanaugh were also required by law to notify the United States in writing of the reasons for each overpayment.

227. Pursuant to 42 U.S.C. § 1320a-7k, each failure by Cavanaugh and Plaza Medical Centers Corp. to return an overpayment within the statute's 60-day deadline is an independent false claim for concealing or avoiding an obligation to pay or transmit money or property to the United States enforceable under 31 U.S.C. § 3729 – the False Claims Act.

228.  Although Plaza Medical Centers, Corp. and Cavanaugh had actual knowledge of these overpayments, acted in deliberate ignorance of these overpayments, or acted in reckless disregard of their duty to investigate, report, and return these overpayments, it failed to report and return the overpayments made on the patients and diagnoses identified above (and in the exhibits hereto) within the statutory period.

229.  Moreover, although Plaza Medical Centers, Corp. and Cavanaugh have now obtained actual knowledge of the overpayments, they have still failed to report and return the overpayments made on the patients and diagnoses identified above (and in the exhibits hereto) within the statutory period.

230.  By virtue of Plaza Medical Centers, Corp. and Cavanaugh's failure to fulfill their obligations to report and reimburse the foregoing overpayments, the United States suffered damages in an amount to be determined at trial.

WHEREFORE, Relator prays for the relief as set forth below.

## COUNT X
## KNOWINGLY CONCEALING OR KNOWINGLY AND IMROPERLY AVOIDING OR DECREASING AN OBLIGATION TO PAY OR TRANSMIT MONEY OR PROPERTY TO THE GOVERNMENT IN VIOLATION OF 31 U.S.C. SECTION 3729(a)(1)(G), AS TO HUMANA

231.  The allegations contained in Paragraphs 1 through 161 and 219 through 230 are incorporated by reference as if fully set forth herein.

232.  Humana approved and accepted Defendants Cavanaugh and Plaza Medical Centers, Corp. as providers in the Medicare Part C program administered by Humana, Inc. and acted as their agent in the submission of claims data to the CMS.

233.  Humana also approved and accepted Caribe Physician Associates, PMC Kendall, PMC North Shore, PMC Jackson South, PMC Plantation, PMC West Oakland Park, PMC

Homestead, PMC Palmetto Bay, and PMC Physician Associates as providers in the Medicare Part C program administered by Humana, Inc. and acts as their agent in the submission of claims data to the CMS.

234. Under Medicare's rules and regulations, Defendant Humana, Inc. had a duty to ensure that procedures were in place to prevent the submission of false and fraudulent patient information and diagnoses to Medicare, including those contained in Paragraphs 39(a)-(bb) *supra*, and to investigate, detect, and discourage such fraud.

235. The foregoing false diagnoses were in fact submitted by Humana to CMS, and the United States made payment based on this false information.

236. Those payments by the United States were received and retained by Humana.

237. After the seal in this matter was lifted on December 2, 2011, Humana was notified of the false, unsupported, and erroneous diagnoses alleged in Paragraphs 39(a)-(bb) *supra*.

238. Thereafter, Humana had the duty under the Medicare and Medicaid program integrity provisions of the Affordable Care Act to investigate all claims submitted by it on behalf of Plaza Medical Centers and identify any funds received or retained to which Humana and Plaza Medicals Centers were not entitled, also known as "overpayments."

239. Pursuant to 42 U.S.C. § 1320a-7k, Humana was required to report and return each overpayment to the United States within 60 days of the date on which it was identified. Humana was also required by law to notify the United States in writing of the reasons for each overpayment.

240. Pursuant to 42 U.S.C. § 1320a-7k, each failure by Humana to return an overpayment within the statute's 60-day deadline is an independent false claim for concealing or avoiding an

obligation to pay or transmit money or property to the United States enforceable under 31 U.S.C. § 3729 – the False Claims Act.

241.   Humana acted in deliberate ignorance of these overpayments or in reckless disregard of its duty to investigate, report, and return the overpayments, by performing cursory audits of Plaza Medical Center and its network of related entities (including one in July 2012) that it knew or should have known were inadequate to fulfill its statutory obligations to investigate and detect Plaza's misconduct and the resulting overpayments received by the Defendants and failed to report and return the overpayments made on the patients and diagnoses identified above (and in the exhibits hereto) within the statutory period.

242.   Moreover, although Humana now has actual knowledge of the overpayments, it has still failed to report and return the overpayments made on the patients and diagnoses identified above (and in the exhibits hereto) within the statutory period.

243.   By virtue of Humana, Inc.'s failure to fulfill its legal duties to investigate, report, and refund overpayments, the United States suffered damages in an amount to be determined at trial.

WHEREFORE, Relator prays for the relief set forth below.

## RELIEF REQUESTED

244.   Relator prays for judgment against the Defendants, and each of them, as follows:

a.   Damages in an amount equal to three times the amount of the damages the United States has sustained as a result of the Defendants' unlawful conduct;

b.   Civil monetary penalties for each false and fraudulent claim submitted to the United States and each overpayment wrongfully retained;

c.   A permanent injunction, enjoining the Defendants from violating the federal False Claims Act;

d.   Relator's attorneys' fees and costs;

  e.  An order awarding the Relator the maximum award allowed by the False Claims Act; and

  f.  For such further relief as the Court may deem proper and just.

**CLAIM OF RIGHT FOR TRIAL BY JURY**

245. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury for all matters so triable.

DATED this 29th day of January, 2016.

         Respectfully submitted,

         */s/ David E. Werner*
         Philip Freidin
         Florida Bar No.: 118519
         David E. Werner
         Florida Bar No.: 0113436
         Jonathan E. Freidin
         Florida Bar No.: 98955
         **Freidin Brown, P.A.**
         2 S Biscayne Blvd, Suite 3100
         Miami, Florida 33131
         Phone: 305.371.3666
         Fax:  305.371.6725
         pf@fblawyers.net
         dew@fblawyers.net
         jf@fblawyers.net
         *Counsel for Plaintiffs*

          *and*

         Douglas F. Eaton
         Florida Bar No. 0129577
         William Wolk
         Florida Bar No. 103527
         **EATON & WOLK, P.A.**
         2 South Biscayne Boulevard, Suite 3100
         Miami, Florida 33131
         Telephone:  305-249-1640
         Facsimile:  786-221-1759
         Email: deaton@eatonwolk.com
           wwolk@eatonwolk.com

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on the 29th day of January, 2016, a copy of the foregoing complaint and exhibits was served on all parties via CM/ECF.

<u>/s/ *David E. Werner*</u>
<u>David E. Werner, Esq.</u>

## SERVICE LIST

**Dan Gelber, Esquire**
**Adam M. Schachter, Esquire**
Gelber Schachter & Greenberg, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
305-728-0950
305-728-0951 fax
efilings@gsgpa.com
dan@gsgpa.com
aschachter@gsgpa.com
*Co-counsels for Plaintiff*

**Kenneth Lee Blalack, II, Esquire**
**David J. Leviss, Esquire**
**William Buffaloe, Esquire**
**Kevin Feder, Esquire**
**O'Melveny & Myers LLP**
1625 Eye Street, NW
Washington D.C. 20006-4001
202-383-5282
202-383-5414 fax
lblalack@omm.com
dleviss@omm.com
wbuffaloe@omm.com
kfeder@omm.com
*Counsel for Humana Inc.*

**David Deaton, Esquire**
**Stephen Sullivan, Esquire**
**Jennifer Chang, Esquire**
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA
ddeaton@omm.com
ssullivan@omm.com
jchang@omm.com
213-430-6000
213-430-6407 fax
*Counsel for Defendant Humana Inc.*

**Steven M. Weinger, Esquire**
**Helena Tetzelli, Esquire**
Kurzban Kurzban Weinger Tetzelli & Pratt,
P.A.
2650 S.W. 27th Avenue, 2nd Floor
Miami, Florida 33133
305-444-0060
305-444-3503 fax
swmiami@aol.com
sws@kkwtlaw.com
helena@kkwtlaw.com
*Counsel for Plaza Medical Centers,*
*Spencer Angel and Michael Cavanaugh*

**Mark Alan Lavine, Esquire**
Assistant United States Attorney
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
mark.lavine@usdoj.gov
renee.balancier@usdoj.gov
shawn.ball@usdoj.gov

**Robert D.W. Landon, III, Esq.**
Fla. Bar No. 961272
**Ryan C. Zagare, Esq.**
Fla. Bar No. 28700
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
Suite 1100, Miami Center
Miami, Florida 33131-4327
305-373-1000
305-372-1861 fax
rlandon@knpa.com
rzagare@knpa.com
*Counsel for Humana Inc.*